Official Form 417A (12/18)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| RYAN K. WOLFSON, | : | |
| | : | |
| Debtor | : | Chapter 7 |
| | : | Case No. 19-11618-LSS |
| | : | |
| | : | |
| _____ | : | |
| RYAN K. WOLFSON, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Adv. No. 19-50717-LSS |
| | : | |
| MIGUEL CARDONA ON BEHALF OF THE | : | |
| DEPARTMENT OF EDUCATION, | : | |
| NAVIENT SOLUTIONS, INC. | : | |
| PENNSYLVANIA HIGHER EDUCATION | : | |
| ASSISTANCE AGENCY, D/B/A FEDLOAN | : | |
| SERVICING AND AMERICAN | : | |
| EDUCATION SERVICES, | : | |
| | : | |
| | : | |
| Defendants. | : | |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

Pursuant to Rules 8002 and 8003 of the Federal Rules of Bankruptcy Procedure, and Rule

8001-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware,

and in accordance with 28 U.S.C. §158(a)(1), Miguel Cardona[1], on behalf of the Department of

---

[1]  On March 2, 2021, Miguel Cardona replaced Betsey DeVos as the Secretary of Education and
the caption is updated herein pursuant to Fed. R. Bankr. P. 7025 (incorporating Fed. R. Civ. P.
25(d).)

Education, respectfully submits this Notice of Appeal and Statement of Election in conformity with Official Bankruptcy Form B-417A.

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

   Miguel Cardona, on behalf of the United States Department of Education.

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

| For appeals in an adversary proceeding. | For appeals in a bankruptcy case and not in an adversary proceeding. |
|---|---|
|   Plaintiff | |
| **X** Defendant |   Debtor |
|   Other (describe) |   Creditor |
| _____ |   Trustee |
| |   Other (describe) |
| | _____ |

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

   Appeal of the Bankruptcy Court's Judgment on the Complaint to Determine Dischargeability of Student Loans, dated January 14, 2022, finding that Debtor Ryan K. Wilson's student loan debt was dischargeable under 11 U.S.C. § 528(a)(8). A copy of the Order (D.I. 35) and Opinion (D.I. 34) are attached as **Exhibit A**.

2. State the date on which the judgment, order, or decree was entered: .

   January 14, 2022

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: Ryan K. Wolfson, Debtor

   Attorney:
   Timothy J. Weiler, Esq.
   716 North Tatnall Street Wilmington, DE 19801
   Telephone: 302-658-6900
   Email: timweiler@timweilerlaw.com

*Attorney for Debtor*

2. Party: Educational Credit Management Corp., Party in Interest. ("ECMC")

   Attorney:
   Daniel Kerrick
   1311 Delaware Ave.
   Wilmington, DE 19806
   Telephone: 302-656-7540
   Email: dckerrick@dkhogan.com
   *Attorneys for ECMC*

## Part 4: Optional election to have appeal heard by District Court

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

**X** Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

## Part 5: Sign below

*/s/ Jacob Laksin*                          Date: January 28, 2022
Signature of attorney for appellant(s) (or appellant(s)
if not represented by an attorney)

JACOB LAKSIN
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, DE 19899-2046
(302) 225-9409
jacob.laksin@usdoj.gov

EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Ryan K. Wolfson,<br><br>      Debtor. | Chapter 7<br><br>Case No. 19-11618 (LSS) |
| Ryan K. Wolfson,<br><br>      Plaintiff,<br><br>      vs.<br><br>Betsey DeVos on behalf of the Department of Education, Pennsylvania Higher Education Assistance Agency, d/b/a Fedloan Servicing, Navient Solutions, Inc. and American Education Services,<br><br>      Defendants. | Adv. No. 19-50717 |

## OPINION

## I.    INTRODUCTION[1]

In this adversary proceeding, Debtor Ryan K. Wolfson ("Wolfson") seeks a determination that his student loan debt, comprising numerous draws under two outstanding loans now totaling an estimated $95,137.02, is dischargeable under 11 U.S.C. § 523(a)(8).  Under § 523(a)(8), student loan debt is only dischargeable if repayment of the debt would impose an "undue hardship" on the debtor.  The Third Circuit has adopted the

---

[1] This Opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.

*Brunner* test, which consists of three prongs that a debtor must prove by a preponderance of the evidence:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] if forced to repay the loans;
>
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and
>
> (3) that the debtor has made good faith efforts to repay the loans.[2]

Defendants argue that Wolfson fails to carry his burden on any of the three prongs, but I find otherwise. The evidence shows that, despite considerable effort, Wolfson has been chronically un- or underemployed since graduating from college; that his sporadic full-time employment has consisted of low-paying gig work or jobs with little prospect of advancement; and that he has avoided living in abject poverty only through significant financial support from his father. The record further shows that Wolfson's career prospects are unlikely to materially improve over time, and thus, his inability to pay his student loan debt will persist. Wolfson has never made a payment on his student loans, but he has never been in a financial position to do so, and his continual search for gainful employment is enough to find good faith. Wolfson proved by a preponderance of the evidence that repayment of his student loans would result in undue hardship under § 523(a)(8), and accordingly, I conclude that the loans are dischargeable.

In surveying the relevant case law, I took note of the controversy generated by the *Brunner* test. Or rather, the wide-ranging interpretations that courts have historically produced in applying the test. Courts of late have challenged interpretations that, through a

---

[2] *In re Faish*, 72 F.3d 298, 304-05 (3d Cir. 1995).

2

combination of a legislative change and "judicial gloss," result in a test that is far more onerous than the one first articulated in *Brunner*. This will be discussed in further detail below, but in short, I agree with the general premise that the most exacting interpretations of *Brunner* are unmoored from the original test and the plain language of "undue burden."

## II. PROCEDURAL HISTORY

Wolfson filed a voluntary petition under chapter 7 on July 20, 2019 ("Petition Date").[3] The chapter 7 trustee filed a report of no distribution on October 18, 2019[4] and Wolfson was granted a chapter 7 discharge on October 22, 2019.[5] The next day, Wolfson filed the instant action against Betsey DeVos in her capacity as Secretary of the Department of Education ("DOE"), Pennsylvania Higher Education Assistance Agency ("PHEAA"), d/b/a Fedloan Servicing, Navient Solutions, Inc. ("Navient") and American Education Services, seeking a determination that his student loans are dischargeable.[6]

On November 26, 2019, Navient and Wolfson filed a stipulation of dismissal in which they agreed to the discharge of Navient's portion of Wolfson's student loan debt, which was approved.[7] On December 5, 2019, Educational Credit Management Corporation ("ECMC") moved to intervene as a defendant, explaining that it now owns the interests in Wolfson's student loans formerly held by PHEAA.[8] The motion was granted.

---

[3] Chapter 7 Voluntary Petition, D.I. 1. References to "D.I. __" are to the main case. References to "A.P. __" are to the captioned adversary proceeding.

[4] Chapter 7 Trustee's Report of No Distribution, D.I. 18.

[5] Order Discharging Debtor, D.I. 19.

[6] Compl. to Determine Dischargeability of Student Loans, A.P. 1.

[7] Stipulation Between Pl. and Navient Solutions, LLC for Discharge of Debt and for Dismissal of Navient as a Def. in this Adversary Proceeding, A.P. 7.

[8] ECMC's Mot. to Intervene as Party Def., A.P. 9.

The parties engaged in discovery, and a trial was held on December 7, 2020. Wolfson was the only witness at trial. With an evidentiary record in hand, the matter is now ripe for decision.

## III. FINDINGS OF FACT[9]

### Life Circumstances, Education and Work Experience

Wolfson was born on November 28, 1986 and was 34 years old at the time of trial.[10] He is not married and does not have any children.[11] Wolfson has treatable, non-debilitating epilepsy.[12] He was diagnosed with epilepsy with petit mal seizures at age twelve.[13] Wolfson's seizures were controlled with medication until about age 22.[14] Since age 23, Wolfson has not taken medication for his seizures; his neurologist explained that he would have major liver disease if he continued the medication.[15] Instead, he has been treating himself with cannabis for which he obtained a medical cannabis card pursuant to Delaware state law.[16] At one point, Wolfson suffered grand mal seizures due to excessive drinking; he

---

[9] These findings of fact draw on Wolfson's testimony at trial, the facts stipulated to in the Amended Pre-Trial Order and the set of stipulated exhibits A-G that were admitted at trial. These exhibits can be found appended to the Amended Pre-Trial Order ("Pre-Trial Order"), A.P. 28-1. Exhibit B, the Wolfson Deposition attached to the Pre-Trial Order contains copying errors that make the exhibit unusable, so I refer to the version of the exhibit attached to the original proposed Pre-Trial Order, which does not contain the copying errors. Pre-Trial Order Ex. B (Wolfson Dep.), A.P. 27-3.

[10] Wolfson Dep. 10:1-2.

[11] Trial Transcript 29:15-18, Dec. 7, 2020, A.P. 31 ("Transcript").

[12] *See, e.g.,* Transcript 17-18.

[13] Transcript 17:3-10.

[14] Transcript 17:5-10.

[15] Transcript 18: 8:14; Wolfson Dep. 63:20-64:12. *See also* Exhibit C (containing certain of Wolfson medical records).

[16] Transcript 36:16-22.

has largely abstained from drinking for the last ten years.[17]  Any current seizures are of the

grand mal variety.[18]  He generally visits his doctor twice a year; his last doctor visit for his

epilepsy was eight or nine months before trial.[19]

      Wolfson graduated from Penn State in 2010 earning a Bachelor of Science degree in

Business with concentrations in management and marketing.[20]  During college, he had

various part-time jobs at his apartment complex including as night security or taking tags at

the pool in the summer.[21]  Immediately after graduating, Wolfson managed a hip-hop artist

and co-owned a T.V. show with David Ivory, called David Ivory Presents.[22]  Wolfson was

also in charge of marketing for the show.[23]  Neither venture turned a profit, and both failed

by 2014.[24]  Since then, Wolfson has persistently sought work, but with little success.  For

example, from his graduation in 2010 through 2016, he had approximately 30 job interviews

that yielded no offers.[25]  During those years, 80 percent of the jobs he applied for were

---

[17] Transcript 17:5-18:3.

[18] Transcript 17:16-19.

[19] Transcript 36:23-25; Wolfson Dep. 63:1-63:17.

[20] *Id.* at 14:7-25.

[21] Wolfson Dep. 22:16-23:4.

[22] Transcript 21:8-13.

[23] Transcript 37:10-14.

[24] Wolfson Dep. 14-16; Transcript 21:15-18.

[25] Wolfson Dep. 24:2-5

within his degree and experience.[26]  His efforts involved job boards, career fairs, and
multiple recruiters.[27]

   Starting around 2014, Wolfson cared for his grandmother full time for approximately
two years.[28]  For roughly six months after he stopped taking care of his grandmother full
time, he trimmed and packaged cannabis at a dispensary for minimum wage.[29]  Wolfson left
this job voluntarily due to the low wages and issues with management.[30]  Starting in 2017,
Wolfson worked for a home renovation company for about a year developing leads for the
company's door-to-door salesmen.[31]  In the last few months of his employment at the home
renovation company, Wolfson began working part time as a driver for rideshare and food
delivery services.[32]  In 2018, Wolfson quit the home renovation company in order to work
as a driver full time.[33]  He worked as a full time driver until he totaled his car in August 2019
after he suffered a seizure while driving.[34]  This was the first time that Wolfson suffered a
seizure outside of the 6:30 a.m. to 9:30 a.m. timeframe[35]

---

[26] Transcript 24:24-25:8.

[27] Transcript 14:23-15:1.

[28] Wolfson Dep. 34:36-14.

[29] Transcript 34:21-23.

[30] Wolfson Dep. 34:21-36:17.

[31] Wolfson Dep. 38-40.

[32] Wolfson Dep. 41:23-42:2.

[33] *Id.*

[34] Wolfson Dep. 27:12-28:10; Transcript 15:22-16:5.

[35]  Transcript 15:22-16:5 ("indiscernible" augmented by my contemporaneous notes of the
evidentiary hearing).

Since totaling his car, Wolfson has been unemployed.[36]  Wolfson applied to approximately 200 jobs in the ten months after he totaled his car, with no success.[37]  As with the job searches for the last five years, he is applying to any job he can find.[38]  But, while Wolfson's epilepsy is not debilitating, it does limit his job search.  He cannot take a job that starts before 9:30 a.m. due to the risk of seizure and he cannot take a job which requires drug testing because of his cannabis use.[39]  Further, he cannot take a job that requires him to work after 8:00 p.m. because he begins to use cannabis at that time and he must also maintain consistent quality sleep because of his epilepsy.[40]  Wolfson spends about one to two hours each day applying for jobs.[41]  He has not applied for unemployment insurance nor for any disability.[42]

Also, in August 2019, Wolfson was forced to move back in with his parents (first his mother, then his father).[43]  His lease for an apartment in Wilmington expired in August, 2019, he was prohibited from driving for six months because of the seizure and he had no income.[44]  As of the time of trial, Wolfson was not working and had no income.[45]

---

[36]  Transcript 35:16-18.

[37]  Wolfson Dep. 30-32.

[38]  Transcript 24:24-25:8.

[39]  Transcript 25:15-26:6.

[40]  *See e.g.* Transcript 16:14-22, 18:20-19:3, 43:21-44:18, 48:9-11; Wolfson Dep. 78:2-20.

[41]  Transcript 35:19-21.

[42]  Transcript 43:12-17.  Defendants did not argue Wolfson would qualify for either benefit.

[43]  Transcript 11:17-25.

[44]  Transcript 12:8-15.

[45]  *See e.g.* Transcript 24:2-5; 35:16-18.

**Financial Circumstances, Income and Expenses**

      Wolfson has relied on financial support from his father for his entire adult life, even when he was working.[46]  For example, as of the Petition Date, Wolfson's monthly income from his driver work was $1,137.39 and he received assistance from his father of $1,335 per month for a total monthly income of $2,472.39.[47]  Matched against his-then expenses of $2,475.00,[48] Wolfson was essentially breaking even, but only with his father's help.  His main expenses were rent of $725, which was mostly paid by his father, electricity, food, car insurance and transportation.[49]

      As of the trial, Wolfson's expenses totaled approximately $1,430 per month, consisting of:[50]

- $140 for telephone, cell phone, internet, satellite, and cable services.

- $400 for food and housekeeping supplies.

- $85 for clothing, laundry, and dry cleaning.

- $25 for personal care products and services.

- $410 for medical and dental expenses.

- $300 for transportation.

- $10 for entertainment and recreation.

---

[46]  Transcript 15:13-16.

[47]  Ex. D (Schedule I); Transcript 30:18-25.

[48]  Ex D (Schedule J).

[49]  Transcript 31:20-25.

[50]  These figures are taken from the expenses listed on Wolfson's Schedule I (Ex. D), adjusted according to his testimony at trial discussing which of the listed expenses he no longer pays.  *See* Transcript 32:4-34:4.  I note these expenses generally do not exceed the 2021 Allowable Living Expenses published by the Internal Revenue Service.

- $60–75 for vehicle insurance, which Wolfson maintains for the purpose of borrowing other people's cars.

Wolfson's father has paid all Wolfson's expenses from the Petition Date to the trial.[51]

As of the date of the trial, Wolfson's father was still giving plaintiff about $1000 per month.[52]  Prior to leaving his Wilmington apartment in 2019, Wolfson's father was contributing approximately $2000 per month toward Wolfson's living expenses.[53]

Wolfson has not had health insurance since he came off of his father's policy at age 25 followed by two years of insurance through the Affordable Care Act.[54]  He can't afford health insurance and it would not cover his cannabis in any event.

Wolfson's family gifted him the car he used to go to work and ultimately, to work as a full-time Uber/Lyft/Grubhub driver.[55]  When the car was totaled, Wolfson received $6,067.50 in insurance proceeds as a result.[56]  He used the funds to "hold him over" and pay some of his bills until he could find a new job.[57]

---

[51] *Id;* Transcript 46:14-17.

[52] Transcript 31:1-4.

[53] Transcript 23:14-25.

[54] Transcript 19:9-21.

[55] Transcript 39:11-21; 48:15-23; Wolfson Dep. 24:15-25:4.

[56] Ex. F (8/14/2019 Letter from GEICO); Transcript 39:21-40:3.

[57] Transcript 40:4-11.

Wolfson's father is retired, is around 74 years old and lives in a one-bedroom apartment in Abington, Pennsylvania.[58] He has suffered financial distress and impacted credit due to his support of his son.[59]

**The Loans**

As of the date of the Amended Pre-Trial Order, Wolfson's student loans ("Loans") totaled approximately $95,137.02 "excluding late fees, interest and other charges to date."[60]

Wolfson signed two Master Promissory Notes ("MPN") under which he borrowed funds to finance his education.[61] On August 12, 2005, Wolfson obtained a Federal Family Education Loan ("FFEL") by executing a Federal Stafford Loan Master Promissory Note ("FFEL MPN").[62] The FFEL MPN provides for a ten year repayment period beginning the day after a 6-month grace period, which in turn begins, as relevant here, the day following graduation, unless the debtor opts into some alternative repayment plan.[63] Wolfson did not

---

[58] Transcript 11:15-16; Wolfson Dep. 14:2-6.

[59] Wolfson Dep. 71:17-25.

[60] Am. Pre-Trial Order 2.

[61] MPNs are form agreements promulgated by the DOE. *See Master Promissory Note (MPN)*, Federal Student Aid (Jan. 15, 2021), https://studentaid.gov/mpn/.

[62] Both Defendant ECMC and Defendant Betsey DeVos assert claims under the FFEL MPN. ECMC attached the FFEL MPN as Exhibit A to Ex. A (Affidavit of Kerry Klisch) seeking payment of two advances made September 7, 2006 in the amount of $3,500 and August 29, 2007 in the amount of $5,500. Ex. A (Klisch Aff.). The DOE attached the FFEL MPN as Exhibit A to Ex. E (Affidavit of Christopher Bolander) seeking payment for two advances made from October 19, 2005 through January 4, 2006 in the amounts of $1,998 and $627. Ex. E (Bolander Aff.). There is no explanation why the advances under the Note are split between two Defendants or the legal authority for doing so. This was not raised, however.

[63] Sample FFEL MPN 5. Only the front page of the FFEL MPN was submitted as an exhibit. A period-accurate copy of the form FFEL MPN (OMB No. 1845-0006 Exp. Date 9-30-2005) can be found at https://web.archive.org/web/20040304094951/http://www.ifap.ed.gov/dpcletters/GEN0207.html.

enter such a plan, so his repayment period was, at most, ten years running from the end of his six-month post-graduation grace period.[64] While the record lacks a precise date, Wolfson graduated in 2010. Assuming that Wolfson graduated in late spring as is customary, and assuming no default and acceleration of the FFEL, Wolfson's repayment period for the FFEL ended by its terms in the October/November 2020 time frame and this Loan is currently due and owing in full.[65] Wolfson defaulted on the FFEL on May 5, 2013, prior to the ending of the contractual repayment period.[66] Thereafter, the entire amount of the FFEL was accelerated and became due and payable.[67]

On May 29, 2008, Wolfson executed a Direct Loan Master Promissory Note ("Direct Loan MPN") pursuant to the William D. Ford Federal Direct Loan Program ("Direct Loan").[68] As with the FFEL, the Direct Loan contemplates a ten-year repayment period after a six-month grace period.[69] Again, there is no evidence that Wolfson chose a repayment plan other than the standard ten-year plan, so the repayment period for the

---

[64] Transcript 40:15-21.

[65] Even assuming that Wolfson graduated on the final day of 2010, his repayment period would end roughly around mid-2021, giving him less than six months from the date of trial to satisfy his loans.

[66] Ex. E. (Bolander Aff.) ¶ 3, Certificate of Indebtedness # 1 of 2; FFEL MPN 2.

[67] *Id;* see also, Federal Stafford Loan Master Promissory Note Instructions and Notices ("Sample FFEL MPN") ¶18, Federal Student Aid, https://web.archive.org/web/ 20040304094951/ http://www.ifap.ed.gov/dpcletters/GEN0207.html ("Consequences of Default - Default is defined in detail in my MPN. If I default, the entire unpaid balance and any accrued collection fees on the applicable loans will become immediately due and payable.").

[68] Ex. E (Bolander Aff.) (Exhibit C, Signed Direct Loan Master Promissory Note). The DOE attached the Direct Loan MPN and the first page of the Addendum to Exhibit C of Ex. E.

[69] Direct Loan MPN 2.

Direct Loan also ended by its terms in the October/November 2020 time frame. Wolfson also defaulted on the Direct Loan and the interest was capitalized.[70]

Wolfson's father made minimum payments on the Loans he co-signed. Wolfson has never made a voluntary payment on the Loans because he has never been in a position to do so.[71] Wolfson is eligible to consolidate certain of the Loans and obtain various payment options (i.e. a Standard Repayment Plan, Income Contingent Repayment Plan, Income-Based Repayment Plan and/or Revised Pay as You Earn Plan).[72] He has not applied to any of these programs because he does not believe it makes sense to commit to another 15 to 20 year contract when his situation will not change.[73]

Except for the months of August and September, 2019 (the month he received the $6000 payment from the insurance company and the next month), Wolfson had an ending balance in his checking account of less than $800.[74] In four of those months, he had an ending balance of less than $10.00.[75] He does not have a credit card.[76] Because of his low

---

[70] Ex E (Affidavit of Christopher Bolander) ¶ 7, Certificate of Indebtedness #2 of 2. The Direct Loan MPN was also arguably accelerated. While we could not locate an exemplar copy of the complete addendum (Revised 01-2008) on the internet, a later iteration of the Addendum contains the same language contained in the FFEL MPN. *See* Exemplar Direct Loan MPN 6 found at Federal Student Aid, https://fsapartners.ed.gov/knowledge-center/library/historical-resources/2008-06-23/summary-revised-master-promissory-note-direct-subsidized-loans-and-direct-unsubsidized-loans-corrected-attachments-7102008.

[71] Transcript 26:7-14; Pre-Trial Order 2; Ex. E (Affidavit of Christopher Bolander) ¶ 8.

[72] *See e.g.* Ex. A (Affidavit of Kerry Klisch) ¶¶2, 20; Ex. E (Affidavit of Christopher Bolander) ¶¶ 10-17.

[73] Transcript 26:15-27:17.

[74] Pretrial Order Ex. G (2019 Monthly statements for Wells Fargo Everyday Checking Account).

[75] *Id.*

[76] Transcript 28: 1-2.

income and student loan debt, Wolfson's credit rating is poor and he is unable to obtain a loan without a co-signor.[77]

## IV. DISCUSSION

### A. Dischargeability Under 11 U.S.C. § 523(a)(8)

The Bankruptcy Code generally excludes certain educational loans from the chapter 7 discharge:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> > (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
> >
> > > (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or part by a governmental unit or nonprofit institution; or
> > >
> > > (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> > >
> > > (B) any other education loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual . . .[78]

The parties agree that Wolfson's student loans are nondischargeable under § 523(a)(8) unless Wolfson can prove that repayment will impose an undue hardship. As "undue hardship" is not defined in the Bankruptcy Code, it has fallen to the courts to articulate its meaning.

---

[77] Wolfson Dep. 83:5-18.

[78] 11 U.S.C. § 523(a)(8).

The Third Circuit employs the *Brunner* test, which consists of three prongs:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] if forced to repay the loans;

> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and

> (3) that the debtor has made good faith efforts to repay the loans.[79]

The burden is on the debtor to establish all three elements by a preponderance of the evidence; if the debtor fails as to any of the three prongs, the inquiry ends, and the debt will not be discharged.[80] The *Brunner* test is the "definitive, exclusive authority" that courts must use to make the undue hardship determination, and "[e]quitable concerns or other extraneous factors not contemplated by the *Brunner* framework" should not be considered.[81]

### B. The First *Brunner* Prong: Minimal Standard of Living

The first prong "requires an examination of the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary."[82] A minimal standard of living consists of having one's basic needs met, such as food, shelter, utilities, transportation, healthcare, and some small source of recreation.[83] A debtor need not live in "abject poverty" to fall below a minimal standard of living.[84] The

---

[79] *Faish*, 72 F.3d at 304-05.

[80] *Id.*

[81] *Id.* at 306.

[82] *Id.* at 305.

[83] *In re Ivory*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001) (listing components of a minimal standard of living in modern American society).

[84] *Faish*, 72 F.3d at 305.

court must determine if the debtor, after maximizing income and minimizing expenses, will have disposable income with which to pay his student loan debt.

As an initial matter, I will not count third-party charity as income for the purposes of the *Brunner* test. Wolfson has been substantially supported by his parents for his entire adult life, with his father furnishing him with $1,000 to $2,000 a month for living expenses. This support is not "income" within the meaning of *Brunner*; rather, it is familial charity that Wolfson's father is not legally obligated to provide, and which could cease at any moment. As Judge Kendig noted in *Hutsell*, the *Brunner* test demands inquiry into whether the debtor can *support himself* as an individual, and charity should not generally[85] be considered income if it is necessary to maintain a minimal standard of living.[86]

Even without repaying his loans, Wolfson's income is insufficient to maintain a minimal standard of living. This is clearly the case at present given that he is unemployed and has no income, and I am satisfied by Wolfson's efforts to maximize his income. Wolfson testified to his long-running, expansive, and largely futile job search since graduation, at first seeking a job within his conferred degree and subsequently taking any

---

[85] "Generally" leaves open the possibility of some unusual set of circumstances involving, for instance, significant familial wealth that calls into question the good faith of the debtor seeking discharge. No such circumstances are present here.

[86]     The concept of a "minimal standard of living" requires a certain degree of financial independence and control. Thus, a debtor's receipt of charity from a third party who is under no legal obligation to provide such support should generally not be considered income for purposes of *Brunner*, when, without such support, the debtor cannot maintain a minimal standard of living and repay her loans. To hold otherwise would be to pin on *Brunner* a punitive standard not contained therein.

*In re Hutsell*, No. 18-61474, 2020 WL 1213600, at *7 (Bankr. N.D. Ohio Mar. 9, 2020) (citing *In re Rosenberg*, 610 B.R. 454, 458 (Bankr. S.D.N.Y. 2020).

job he could find.[87]  Since his August 2019 accident, Wolfson spends around one or two hours a day on internet job boards applying to open positions.[88]

Defendants make several arguments.  The DOE contends that spending "only" an hour a day seeking employment amounts to Wolfson "barely looking for work."[89]  This might have been a fair characterization in the past, but today, online job applications are ubiquitous and often the only way to apply for a job.[90]  Wolfson's lack of success does not appear to stem from the amount of time he spends on job applications; at least, the DOE elicited no evidence to that effect.

Nor is Wolfson avoiding work.  ECMC argued that Wolfson was "holding out" for a job that would allow him to move out on his own, but this misstates Wolfson's testimony.[91]  Wolfson did testify that he was "applying to anything that pays well enough to live on my own," but he did not say that he was ignoring jobs below a certain level of pay.  On the contrary, when asked what sort of jobs he has been looking for, Wolfson replied: "Anything.  And that's been my way for about over five years now."[92]  Wolfson's employment history supports his testimony.  He estimated that he has had over thirty jobs

---

[87]  Wolfson Dep. 24:2-5; 30:6-8.

[88]  Transcript 35:19-21.

[89]  Transcript 78:6.

[90]  *See e.g. Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 883 (7th Cir. 2013) (observing that the lack of internet access when coupled with a lack of transportation hampers a search for work).

[91]  Transcript 86:20-21 ("He's not looking for a job to pay towards his debt or to pay reasonable expenses.  He's looking for a job and holding out for a job that he can move out and live on his own, and that was his testimony.").

[92]  Transcript 25:1-2.

throughout his life.[93]  Wolfson's motley assortment of past jobs contradicts the suggestion that he has been picky, and there is no evidence whatsoever that he has turned down offers for work.

While Wolfson's circumstances changed considerably since he originally filed his chapter 7 petition, complicating this analysis somewhat, ultimately it remains clear that he meets prong one.  His expenses were and still are minimal, and Defendants did not challenge any of Wolfson's spending.  The only apparent controversial item in Wolfson's budget is the approximately $400 a month he spends on cannabis, which he takes for his epilepsy in lieu of pharmaceuticals.  But, Wolfson obtained a medical cannabis card under Delaware law.[94]  In any event, removing this expense does little to improve Wolfson's budget.  Wolfson does not have health insurance, and it is undisputed that his epilepsy requires treatment.  Any savings realized by eliminating his cannabis usage would be at least offset by health insurance and/or medication costs, which Wolfson currently does not pay.  Thus, if anything, Wolfson's expenses appear to be understated, because healthcare is a necessary component of a minimal standard of living.[95]

Based on Wolfson's current income and expenses, he cannot maintain a minimal standard of living if forced to repay the Loans.  Prong One of the *Brunner* text is satisfied.

### C. The Second *Brunner* Prong: Inability to Pay Will Persist

The second *Brunner* prong requires a debtor to show that "additional circumstances exist indicating that the inability to repay the student loan without impairing the debtor's

---

[93] Transcript 49:25.

[94] I am not making any independent judgment on medical cannabis use.

[95] *In re Ivory*, 269 B.R. at 899.

minimal standard of living is likely to persist for a significant portion of the repayment period for the student loans."[96]

### 1. Repayment Period

The repayment period should consist of the contract term currently in force, not a hypothetical term that might apply had the debtor entered a repayment plan.[97] Here, the ten-year repayment period for both the FFEL and the Direct Loan have run. It is also likely that both Loans were accelerated upon default.

Regardless, this leaves me with the thorny question of how, for the purposes of the *Brunner* test, to treat a repayment period that has already run. There is a near-complete lack of authority on this issue, and only two of the many cases reviewed confront it. In *Rosenberg*, Chief Judge Morris found that because the debtor's loans were accelerated, and his repayment period ended, the debtor met the second prong as a matter of law.[98] Chief Judge Morris did not elaborate on her reasoning, likely because it is obvious: the second prong calls on the court to predict the events of a set future period. If that period has already passed, there is nothing to predict, and the inquiry necessarily ends in the debtor's favor.[99]

---

[96] *Brunner*, 831 F.2d at 396.

[97] *See Rosenberg v. Educ. Credit. Mgmt.*, 610 B.R. 454, 461 (Bankr. S.D.N.Y. 2020) (citing ROBERT M. LAWLESS, ABI COMMISSION ON CONSUMER BANKRUPTCY, FINAL REPORT OF THE ABI COMMISSION ON CONSUMER BANKRUPTCY 2017-2019 FINAL REPORT AND RECOMMENDATIONS 12 (2019)), *rev'd in part, aff'd in part and remanded*, No. 20-CV-688 (CS), 2021 WL 4461341 * 10 notes 20, 23 (Sept. 29, 2021) (rejecting bankruptcy court's legal analysis on the second *Brunner* prong, while discussing the point as part of the first prong of the *Brunner* analysis).

[98] *Rosenberg*, 610 B.R. at 461 ("His circumstances will certainly exist for the remainder of the repayment period as the repayment period has ended and the loan is due and payable in the full amount. The second prong of the *Brunner* test is, therefore, satisfied.")

[99] On appeal, the district court rejected the analysis of the effect of acceleration of the loan. In summary fashion in a footnote, the district court refers the reader to its earlier analysis of the effect

The bankruptcy court in *Nitcher*[100] concluded that the applicable repayment period for prong two is the contractual repayment term for each loan resulting in repayment periods of zero for two of the three loans at issue. Judge McKittrick relied on what he correctly characterized as the in-depth analysis in *Price*. The *Price* court, while not faced with a contract term that had already expired, engaged in an extended discussion of the appropriate repayment period. Judge Frank concluded that at least where a debtor chose in good faith not to enter into an extended term student loan repayment program, the repayment period is the remaining term of the contract.

I join Chief Judge Morris and Judge McKittrick in applying the second prong of the *Brunner* test as written and conclude that Wolfson satisfies this prong because his repayment period has already ended. As stated above, the second prong is whether the debtor's inability to maintain a minimal standard of living if forced to repay the loan will persist for a significant part of *the repayment period*. The second prong directs courts to look at the *current* repayment period, not a hypothetical one. Here, the repayment period ended either in 2021 at the end of the ten-year repayment period or upon default when the MPNs were automatically accelerated. While I appreciate Judge Frank's analysis in *Price*, I would not import the good faith requirement into this prong of the *Brunner* analysis. I find compelling the counter-arguments in Judge Frank's analysis—including that (i) inserting the good faith

---

of the acceleration of the loan on the first prong of the *Brunner* test. The district court appears to ignore the bankruptcy court's means test analysis picking up on only one paragraph of the bankruptcy court's discussion of the first *Brunner* prong. The district court then rejects the concept that a debtor can satisfy the first *Brunner* prong by simply showing that he cannot pay the full accelerated amount of the loan in one single payment. Even if the district court is correctly interpreting the bankruptcy court's decision with respect to the first *Brunner* prong, it offers no explanation for its disagreement on the second prong.

[100] *Nitcher v. Educ. Credit Mgmt. Corp. (In re Nitcher)*, 606 BR 67, 78 (Bankr. D. Ore. 2019).

analysis into this second prong injects unnecessary and speculative determinations into an already difficult forward-looking analysis;[101] (ii) use of the contractual term is consistent with a debtor's actual obligation, not a hypothetical one with the potentially devastating consequences of capitalized interest, a consequence that has already occurred on Wolfson's Loans[102] and (iii) any fear of gamesmanship by intentionally avoiding entering into a repayment plan can be adequately addressed in the third prong. [103]

    At bottom, I conclude that an objective standard for the repayment term better reflects the applicable standard and would end the analysis of *Brunner's* second prong here. Because, however, of the dearth of authority on this issue, and because Wolfson satisfies this prong even under a hypothetical extended repayment period, I will proceed to the "additional circumstances" portion of the analysis.

---

[101] *Price*, 573 B.R. at 605 ("Use of a twenty (20) or twenty-five (25) year extended term as the repayment period under *Brunner* arguably requires that the court predict what the debtor's circumstances will be ten (10) or fifteen (15) years into the future. In many cases, such determinations will be nothing more than mere guesswork, without any reasonable degree of certitude. Such a failure to engage in a grounded, realistic analysis not only creates the danger of an overly-strict application of *Brunner*, but also raises legitimate concerns about both the integrity of the judicial decision making process, as well as the public's perception of the process.")

[102] *Id.* ("Because REPAYE requires loan consolidation, it results in the capitalization of accrued interest. Capitalization means that individuals on REPAYE are now paying interest on interest. If the REPAYE-borrower's income does not improve within a few years, the loan can reach a kind of "escape velocity," in which a borrower's meager income will never be applied to the original principal and the loan balance will only grow for the next several decades.")

[103] Judge Frank acknowledges that his holding elevates the importance of the third prong of the *Brunner* test insofar as a debtor's decision to enter or not enter an extended loan repayment program impacts the application of the second *Brunner* prong. *Price*, 573 B.R. at 606 n.40. I believe the three prongs of the *Brunner* test should be separate and discreet. In addition to Judge Frank's counter arguments, I am persuaded by the historical context of the *Brunner* decision. As Judge Frank notes in *Price*, when *Brunner* was decided the amount borrowed by students was "usually modest." As a practical matter, if a student loan was excepted from discharge, the debtor could be expected to repay it within a reasonable time. Further, income driven repayment programs were virtually unknown, and there was a five-year temporal discharge available. The court that crafted the *Brunner* test did not contemplate a 20- or 25-year repayment plan. *Id.* at 599.

## 2. Additional Circumstances

As stated above, the second prong requires that the debtor prove "that additional circumstances exist indicating that [he] cannot maintain a minimal standard of living for a significant portion of the repayment period if forced to repay [his] loans."[104] There are no set criteria for what constitutes "additional circumstances," but recurring examples include "long-term physical or mental problems precluding employment, lack of marketable job skills, or the necessity of fully supporting several dependents which precludes sufficient income."[105] This list is not exhaustive, and the presence or absence of any particular circumstance is not dispositive; rather, the inquiry is fact-intensive and case-specific.[106]

This prong is the subject of much of the recent controversy surrounding the *Brunner* test, particularly as to the import of the phrase "certainty of hopelessness."[107] In *Price*, Judge Frank surveyed the wide-ranging interpretations of the prong, noting that some courts have gone so far as to require proof that "it must be unlikely that the debtor '**will ever be able to**' repay the loan," a standard which contradicts the clear temporal limitation of the repayment period.[108] Judge Frank held that it is incorrect as a matter of law and contrary to the "fresh start" policy of bankruptcy to "impose a lifetime yoke on bankruptcy debtors." He regarded

---

[104] *Brightful*, 267 F.3d at 328.

[105] *In re Speraza*, 366 B.R. 397, 411 (Bankr. E.D. Pa. 2007)

[106] *See In re Price*, 573 B.R. 579, 595 (Bankr. E.D. Pa. 2017), *rev'd on other grounds sub nom. DeVos v. Price*, 583 B.R. 850 (E.D. Pa. 2018) (citing *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013)).

[107] The phrase was coined in *In re Briscoe*, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981), a case that, notably, precedes *Brunner* itself.

[108] *Price*, 573 B.R. at 607 (citing *In re Nightingale*, 529 B.R. 641, 651 (Bankr. M.D.N.C. 2015)).

the phrase "certainty of hopelessness" as dicta that has subsumed the true standard,[109] a
concern also voiced by Judge Posner in *Krieger*.[110] Chief Judge Morris rejected the phrase in
*Rosenberg*, and described it as part of a pattern of "retributive dicta" that has iteratively
heightened *Brunner* into "a quasi-standard of mythic proportions so much so that most
people (bankruptcy professionals as well as lay individuals) believe it impossible to
discharge student loans."[111] I join in noting this problematic trend. The Third Circuit made
clear, however, that the standard is difficult to meet, and in *Brightful* quoted the "certainty of
hopelessness" language approvingly.[112]

Even accepting that a "certainty of hopelessness" is something more than judicial
gloss, Defendants' interpretation of the standard is overly strict. The DOE argued at trial
that Wolfson failed to show that his epilepsy will prevent him from obtaining future
employment, and thus failed to prove "additional circumstances" under the *Brunner* test.[113]
This argument fails on two fronts. First, Wolfson is not required to prove that his epilepsy,
specifically, is hampering his job prospects. A debilitating medical condition undoubtedly
can constitute an "additional circumstance," but it is not required. Second, Wolfson does

---

[109] *Price*, 573 B.R. at 601 n.31 ("The phrase 'certainty of hopelessness' has been used regularly by
many courts over the years. This was unfortunate. The phrase is inaccurate and has led too many
courts to employ it as an independent legal standard under § 523(a)(8). It is time to retire its use.")

[110] *See Krieger*, 713 F.3d at 884 ("The statutory language is that a discharge is possible when payment
would cause an 'undue hardship'. It is important not to allow judicial glosses, such as the language
in *Roberson* and *Brunner*, to supersede the statute itself.").

[111] *Rosenberg*, 610 B.R. at 458-59.

[112] *Brightful*, 267 F.3d at 328.

[113] *See* Transcript 72:21-24 ("[I]t is . . . the plaintiff's burden to carry to show that the plaintiff will
not be able to secure employment for the significant portion of the repayment period because of his
epilepsy.")

not need to prove that he is entirely forestalled from future employment; rather, he need only prove that his future income will not allow him to both maintain a minimal standard of living and repay the Loans. Something less than permanent unemployment, then, can suffice.

Wolfson is not just able, but is likely to be employed in the future; however, his work history shows that he is unlikely to ever receive an income sufficient to pay his student loan debt. He is still young and has a college degree, and if he were perhaps only a year or two removed from his graduation, I could be more sanguine about Wolfson's future. But a decade has passed, and in the wake of his failed postgraduate entrepreneurial ventures, Wolfson's resume consists of unprofitable gig work and low- to minimum-wage jobs bearing little hope of advancement, punctuated by periods of unemployment. I cannot find, as Defendants argue, that "we don't know what the future holds for the plaintiff," or that "six months later . . . circumstances may change."[114] Simply put, Wolfson's is "not the sort of background employers are looking for. There is no reason to think that a brighter future is in store."[115] Instead, there is every reason to think that whatever work Wolfson obtains in the future will be of a similar character to that of the past ten years. "In the absence of some reason to expect change, a lengthy history of financial struggles is a valid indicator of more of the same."[116] As discussed above, Wolfson's lack of success is not a question of effort, and there is nothing to indicate that he is artificially depressing his income.

---

[114] Transcript 79:3-6; 84:20.

[115] *Krieger*, 713 F.3d at 884; *see also Brightful*, 267 F.3d at 330 (listing "lack of usable job skills" as an example of an additional circumstance warranting discharge).

[116] *In re Armstrong*, No. 10-82092, 2011 WL 6779326, at *8 (Bankr. C.D. Ill. Dec. 27, 2011).

Although I have, alternatively, entertained a hypothetical extended repayment period for the purposes of this alternative analysis, I will not consider hypothetical income-based payment adjustments. Defendants provided evidence that Wolfson, due to his low income, would be eligible for an income-based repayment plan that would set his payment to $0 per month, with any remaining balance forgiven at the end of the extended repayment period.[117] Obviously any debtor can "afford" such a plan, but it cannot be compulsory. I noted at argument, assuming a hypothetical $0 per month repayment plan would have the effect of completely foreclosing debtors in the lowest income bracket of such plans from receiving an undue hardship discharge, a backwards result that would render § 523(a)(8) a nullity.[118] It cannot be that Congress intended to make it more difficult—or even impossible—to obtain a discharge the lower the debtor's income.

Wolfson's student loan debt now totals around $100,000 and growing,[119] and it is a virtual impossibility that he will ever pay it off, regardless of the length of the hypothetical repayment period. While it pains me to assign him such grim prospects, viewing Wolfson's situation with unwarranted optimism will only do him a disservice.

---

[117] Bolander Aff., at 4-6.

[118] *See* Transcript 85:17-19 ("Every debtor could maintain a zero payment. So that can't be the test, or we'd have no loans being discharged.").

[119] Notwithstanding any temporary moratoriums put in place in response to COVID-19.

## D. The Third *Brunner* Prong: Good Faith Effort to Repay

The final prong requires the debtor to prove a good faith effort to repay the loans. "The good faith inquiry is to be guided by the understanding that undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control."[120]  The debtor's history of payment on the loans is not itself dispositive; rather, courts focus on the debtor's efforts to pay, and whether the debtor can justify a history of nonpayment.[121]  To that end, courts examine the debtor's "efforts to obtain employment, maximize income, and minimize expenses."[122]  Courts also consider the debtor's consideration of and participation in income-based repayment plans.[123]  But, the significance of such repayment plans is "necessarily dependent on the circumstances of the particular debtor seeking discharge of his or her student loans."[124]

Though Wolfson has never made a voluntary payment on his student loans, he has never been in a financial position to do so and has shown good faith in his efforts to maximize income and minimize expenses, as described in the prong one analysis.  Wolfson credibly testified as to his efforts to obtain gainful employment over the years, and

---

[120] *In re Faish*, 72 F.3d at 305 (quotations omitted).

[121] *See In re Crawley*, 460 B.R. 421, 446 n.36 (Bankr. E.D. Pa. 2011) ("The failure to have made any repayments on a student loan is not a litmus test for good faith under the third prong of the *Brunner* test.  The good faith determination depends on the reasons why the Debtor did not make the payments."); *see also Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1311 (10th Cir. 2004) ("[T]he failure to make a payment, standing alone, does not establish a lack of good faith.").

[122] *In re Bukovics*, 612 B.R. 174, 191 (Bankr. N.D. Ill. 2020).

[123] *See In re Crawley*, 460 B.R. 421, 444 (Bankr. E.D. Pa. 2011) ("[A]ll courts consider the Debtor's willingness to participate in the ICRP as a factor to be considered under the good faith prong of the *Brunner* test . . .").

[124] *Id.*

Defendants provided no evidence to the contrary. It is plain that Wolfson's history of low-paying jobs and gig work comes from necessity, not choice, and at no point has Wolfson had steady surplus income that would allow him to pay down the Loans. Though Wolfson has restricted his job search in conformity with his 9:30 a.m. start time and drug testing requirements, his testimony as to those requirements went uncontroverted. Defendants did not contest the necessity of the restrictions, and I am persuaded that Wolfson observes these limitations in good faith. Wolfson is not using these limitations to dodge work, which is again corroborated by the variety of jobs he has worked in the past, and these restrictions are not so onerous as to explain Wolfson's marked lack of success in finding work in general.

Defendants suggested that Wolfson may have been able to eke out at least some token payments as a demonstration of good faith, pointing in particular to the $6,000 in insurance coverage Wolfson received for his totaled car. Wolfson testified that he used this money on living expenses, but Defendants argued that he could have carved off some portion of it to pay down his student loans. While this would be helpful to Wolfson's case, I will not fault debtors for failing to make payments that are ultimately performative when their overall financial position makes those payments futile. It is enough to show, as Wolfson has, that the debtor has made a good faith effort to maximize income and minimize expenses, and that the failure to make payments stems from inability, not unwillingness.

Wolfson's choice not to enter an income-based repayment plan does not preclude a finding of good faith, because his future employment prospects make it unlikely that he will ever make meaningful payments on such a plan. Wolfson testified that he briefly explored

these plans and rejected them, reasoning that they were pointless for someone in his circumstances. I agree. This is not a case where the debtor's earnings are likely to substantially increase over time, e.g., a recently graduated medical doctor. Nor is this a case where the debtor's financial hardship is temporary, e.g., a passing illness or brief window of unemployment in an otherwise steady career. Defendants argue that "we don't know what the future holds"[125] for Wolfson, implying that he may happen across some lucrative career path that has evaded him these past ten years that will allow him to pay his debt. But this is mere speculation, unsupported by the record. The record indicates that low income will be a persistent feature of Wolfson's life, and that all an income-based repayment plan will accomplish in his circumstances is waylay the discharge of his debts for an additional ten to twenty-five years while continuing to sabotage any chance of improving his credit.[126] His failure to engage in this futile exercise does not amount to bad faith.

Despite his apparent best efforts to maximize income and minimize expenses, Wolfson has never had the discretionary income to make meaningful payments on his Loans. Because the record indicates that this state of affairs will continue, he cannot be faulted for declining to enter into an income-based repayment plan. Wolfson has carried his burden on the third *Brunner* prong.

---

[125] Transcript 84:20.

[126] Wolfson also argued that loan forgiveness would result in a significant tax liability, which ECMC contested. ECMC later sought leave for post-trial briefing on the issue, which I denied. In light of that denial, and because it is not dispositive to this ruling, I will refrain from considering the issue.

## E. Policy Considerations

Though the Third Circuit dictates that "equitable concerns or other extraneous factors not contemplated by the test may not be imported into the analysis,"[127] I will, at the parties' urging, briefly discuss the policy implications of this decision. Defendants argue that the high standard imposed in *Brunner* safeguards the integrity of the student loan system, as expressed by the Third Circuit in *Faish*[128] and "successive legislative fixes to the statute" that resulted in a lifetime ban on a discharge, subject to the undue burden standard.[129] Wolfson counters that the "fresh start" policy inherent in the bankruptcy system weighs in favor of discharge.[130]

I credit both concerns, but find that in this particular case, refusing to discharge Wolfson's Loans will do little to protect the integrity of the student loan system. As discussed at length above, Wolfson is unlikely to ever pay down a meaningful amount of his ballooning student loan debt. Entering an income-based repayment plan as Defendants

---

[127] *In re Brightful*, 267 F.3d 324, 328 (3d Cir. 2001).

[128] *Faish*, 72 F.3d at 305-06 ("[T]he *Brunner* standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices.").

[129] Transcript 63:8-66:24. What the legislative "fix" was for is unclear. For an excellent discussion of the history of student loan discharges in bankruptcy *see* Bruce Grohsgal, *A Bad Bargain: The Legislative and Political History of the "Undue Hardship" Requirement for the Discharge of Student Loans in Bankruptcy*, 2021 No. 8 Norton Bankr. L. Adviser NL 1. In his article, Professor Grohsgal explains that the 1998 legislation leading to the enactment of the lifetime undue hardship rule was the result of a budget compromise untethered to any bankruptcy policy objective, any abuse of the bankruptcy system or an examination of the impact on borrower debtors.

[130] *See* Transcript 93:15-17; *see also Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S. Ct. 695, 699, 78 L. Ed. 1230 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.") (internal quotation omitted).

urge he should[131] would yield the same result, concluding with forgiveness of the remainder at the end of the extended repayment period. Given that the ultimate outcome will be substantially the same, there is little benefit to the system in delaying the discharge of Wolfson's loans.

Conversely, the "fresh start" interest in this case is fairly strong. Wolfson is 34 years old and remains dependent on his aging, retired father. He faces an uphill battle in improving his situation, and his father's support cannot continue forever. The burden of student loans only adds to the precarity of his circumstances. The competing policy concerns here weigh in favor of granting the discharge.

## V.    CONCLUSION

For the foregoing reasons, I conclude that Wolfson has proven by a preponderance of the evidence that excepting his student debt from discharge would impose an undue hardship on him. Since graduating from college, this debtor could not afford a modest apartment, food to eat or basic transportation without the assistance of his father. It is not for want of a work ethic. His assortment of jobs, even while working full time, did not permit repayment of his student loans. As there is no evidence to suggest that his plight will improve, Wolfson is entitled to a discharge.

An order will enter consistent with this Opinion.

Dated: January 14, 2021

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[131] *See, e.g.,* Transcript 78:11-15 ([I]f Plaintiff entered a repayment plan, he would qualify for a whole host of repayment options, one of which is the income-based repayment plan, which is a 10-year repayment period. And based on Plaintiff's purported income and expenses, he would pay nothing.").

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Ryan K. Wolfson,<br><br>    Debtor. | Chapter 7<br><br>Case No. 19-11618 (LSS) |
| Ryan K. Wolfson,<br><br>    Plaintiff,<br><br>    vs.<br><br>Betsey DeVos on behalf of the Department of Education, Pennsylvania Higher Education Assistance Agency, d/b/a Fedloan Servicing, Navient Solutions, Inc. and American Education Services,<br><br>    Defendants. | Adv. No. 19-50717<br><br>**Re: Docket No. 1** |

### JUDGMENT

For the reasons set forth in my Opinion of even date, Judgment on the Complaint to Determine Dischargeability of Student Loans [Docket No. 1] is entered in favor of Plaintiff Ryan K. Wolfson and against all Defendants.

IT IS FURTHER ORDERED that Plaintiff's student loan debt is discharged.

Dated: January 14, 2021

Laurie Selber Silverstein
United States Bankruptcy Judge

# Notice Recipients

District/Off: 0311-1         User: admin         Date Created: 1/14/2022
Case: 19-50717-LSS         Form ID: pdfjo         Total: 9

**Recipients of Notice of Electronic Filing:**
aty       Daniel C. Kerrick       dckerrick@dkhogan.com
aty       Ellen Slights       ellen.slights@usdoj.gov
aty       Timothy Joseph Weiler       timweiler@timweilerlaw.com

                                 TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
pla       Ryan K. Wolfson       804 North Van Buren Street       Unit 3       Wilmington, DE 19806
dft       Betsey DeVos       c/o Department of Education       400 Maryland Avenue SW       Washington, DC 20202
dft       Pennsylvania Higher Education Assistance Agency       1200 North Seventh Street       Harrisburg, PA 17102-1440
dft       Educational Credit Management Corporation       PO Box 16408       ST.PAUL, MN 55116 UNITED STATES
ust       U.S. Trustee       Office of the United States Trustee       J. Caleb Boggs Federal Building       844 King Street, Suite 2207       Lockbox 35       Wilmington, DE 19801
ust       U.S. Trustee       Office of United States Trustee       J. Caleb Boggs Federal Building       844 King Street, Suite 2207       Lockbox 35       Wilmington, DE 19899-0035

                                 TOTAL: 6